**Lonnie GHOLSON, Robert Taylor, Nathaniel Scott, James Logan, Ali Salaam, T. Nguyen, and E. Forbes, Plaintiffs,**

**v.**

**Ed MURRY,[1] C.E. Thompson, Ms. Dunn, Ron Angelone, Carl Hester, and Jim Bruce, Defendants.**

**Civil Action No. 2:95cv442.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Jan. 7, 1997.

---

**1.** Plaintiffs misspelled this defendant's name in their Complaint; the correct spelling is Ed Murray.

Lonnie M. Gholson, Craigsville, VA, pro se.

Nathaniel Scott, Boydton, VA, pro se.

Pamela Anne Sargent, Office of the Attorney General, Richmond, VA, for Defendants.

## OPINION AND FINAL ORDER

REBECCA BEACH SMITH, District Judge.

Plaintiffs Lonnie M. Gholson and Nathaniel Scott, both Virginia inmates, brought this *pro se* action pursuant to 42 U.S.C. § 1983, to redress alleged violations of their constitutional rights. For the reasons stated below, the court grants defendants' Motion for Summary Judgment.

### I. Factual and Procedural History

Mecklenburg Correctional Center ("Mecklenburg") is one of three maximum security facilities housing male prisoners within the Virginia Department of Corrections. Maximum security housing units such as Mecklenburg equip themselves to supervise and control inmates who pose a security threat. Disruptive, aggressive, and violent inmates, or inmates needing protective custody, are housed in single cell segregation assignments. In segregation housing, the movement of inmates is stringently controlled and heightened security measures are used. Hester Aff. ¶ 5. Building Two at Mecklenburg is currently closed for renovations, but it used to house high security inmates, such as plaintiffs, who were assigned to long-term segregation, such as those inmates with a history of escape, hostage-taking, assaults on staff members, and other hostile behavior. *Id.* ¶ 10.

According to institutional records, plaintiff Gholson was incarcerated in segregation housing at Mecklenburg from January 26, 1994, until April 3, 1996, when he was transferred to the Augusta Correctional Center. Plaintiff Scott is currently incarcerated in segregation housing at Mecklenburg, and has been there since April 5, 1994. *Id.* ¶ 4. Both plaintiffs have a history of assaultive, disruptive, and hostile behavior. Gholson's institutional record reflects that he has received major infractions for incidents that occurred while he was housed at Mecklenburg, including threatening bodily harm to the staff, flooding his cell, destroying state property, and disobeying orders given by the staff. *Id.* ¶ 7, Ex.B. According to Scott's institutional record, he has incurred at least thirty-seven (37) disciplinary infractions in Building Two

at Mecklenburg for assaulting staff and other inmates with unknown substances, threatening bodily harm to the staff, setting fires, flooding his cell on numerous occasions, and disobeying staff orders. *Id.* ¶ 6, Ex.A. This list of infractions does not include any incidents occurring while Scott was incarcerated in other areas of Mecklenburg. *Id.* ¶ 6.

Plaintiffs' original Complaint, which was filed May 15, 1995, included seven named plaintiffs confined at Mecklenburg Correctional Center at the time the Complaint was filed: Lonnie M. Gholson, Robert Taylor, Nathaniel Scott, James Logan, Ali Salaam, T. Nguyen, and E. Forbes. The Complaint also included three named defendants: Ed Murray (former Head of the Department of Corrections), C.E. Thompson (former Warden), and Ms. Dunn (Head of Food Service).

On May 15, 1995, plaintiffs were instructed to complete a questionnaire designed to elaborate on the claims stated in their original filing. In response to that questionnaire, plaintiffs named three additional defendants to the action and omitted two defendants named in the original Complaint. Since the questionnaire was proffered as an amendment to the original Complaint, on September 22, 1995, the court added defendants Ron Angelone (present Head of the Department of Corrections), Carl Hester (Assistant Warden of Programs), and Jim Bruce (former Head of Treatment), and dismissed defendants Dunn and Thompson from this action.

When plaintiffs Taylor, Logan, Salaam, and Nguyen failed to sign the Complaint and other pleadings as directed by court Order, the court dismissed them from the action without prejudice. On December 22, 1995, the court granted the three remaining plaintiffs, Gholson, Scott, and Forbes, permission to proceed *in forma pauperis*, and ordered their Complaint filed. The court also continued the case for ninety (90) days to permit plaintiffs to exhaust the state prison's internal grievance procedures, and directed plaintiffs to file proof of exhaustion by April 1, 1996. Plaintiff Gholson submitted proof of his individual grievances on February 23, 1996. On March 1, 1996, the court advised the remaining two plaintiffs, Forbes and

Scott, that they must submit their own documentation proving they individually pursued the grievance procedures. Such proof was eventually submitted by Scott. Forbes, however, failed to submit proof of his individual grievances. Accordingly, on June 13, 1996, the court dismissed Forbes from this action. The court also ordered the remaining defendants, Murray, Angelone, Hester, and Bruce, to file responsive pleadings or appropriate motions to plaintiffs' Complaint.

Defendants filed a Motion for Summary Judgment on October 4, 1996, with supporting memoranda, exhibits, and the affidavit of defendant Carl Hester. In accordance with *Roseboro v. Garrison,* 528 F.2d 309 (4th Cir. 1975), defendants gave plaintiffs Gholson and Scott notice of their opportunity to respond to defendants' motion with any material they wished to offer in rebuttal. Defendants also instructed plaintiffs that failure to submit any materials could result in an adverse judgment based on defendants' motion and accompanying exhibits and affidavit. Plaintiffs failed to respond to defendants' Motion for Summary Judgment. This matter is now ripe for determination.

## II. Standard of Review

Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Terry's Floor Fashions v. Burlington Indus.,* 763 F.2d 604, 610 (4th Cir.1985). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. *Celotex Corp.,* 477 U.S. at 322–24, 106 S.Ct. at 2552–53. Such facts must be presented in the form of exhibits and sworn affidavits. Failure by plaintiffs to rebut defendants' motion with such evidence on their behalf will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552.

Section 1983 imposes civil liability on a state official who, under color of state law, deprives any citizen of the United States, or other person under the jurisdiction thereof, of any right secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. To hold a defendant liable under § 1983, the court must first determine whether that defendant acted under color of state law, and "whether the plaintiff has been deprived of a right 'secured' by the Constitution and its laws." *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979). If the answer to either inquiry is "no," the § 1983 action fails. *See id.; McDonald v. Dunning,* 760 F.Supp. 1156, 1160 (E.D.Va. 1991).

## III. Analysis

Although plaintiffs' Complaint is often confusing and their claims of constitutional violations difficult to discern, *pro se* complaints, however unskillfully pleaded, are to be liberally construed. *Vinnedge v. Gibbs,* 550 F.2d 926, 928 (4th Cir.1977). In their original Complaint and in the amendment to the Complaint, plaintiffs allege that: (1) defendants unlawfully denied them an opportunity to work and to obtain an education; (2) they have been served food in a manner that violates their First Amendment right of religious freedom, including their right to practice the pork-free Nation of Islam diet; (3) defendants denied their requests for a transfer to Buckingham Correctional Center, where they could get a proper religious diet; (4) the new outdoor recreational facilities are inadequate because they are too small, and lack water or restrooms; (5) defendants failed to protect the health and safety of inmates by exposing them to water contaminated with lead; (6) defendants denied plaintiffs' requests to leave open the tray slots in

the cell doors, and did not provide adequate ventilation; and (7) defendants improperly reinstated the phase program. In addition to declaratory and injunctive relief, plaintiffs seek $100,000.00 in compensatory damages, and $100,000.00 in punitive damages. The court will not address any of Gholson's claims for declaratory or injunctive relief because they are moot. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir.1991) (inmate's transfer rendered moot his claims for injunctive and declaratory relief). Gholson was transferred to Augusta Correctional Center on April 3, 1996, and is no longer subjected to the conditions complained of at Mecklenburg.

Within defendants' brief in support of their Motion for Summary Judgment, pursuant to Local Rule 10(F)(2), defendants included the following statement of undisputed facts:

1. Gholson and Scott are inmates confined within the [Virginia Department of Corrections]. Both are disruptive, hostile, aggressive, and assaultive, with lengthy histories of major institutional infractions. Both were placed in segregation at [Mecklenburg] because of their maladjustment and behavioral problems.

2. Neither Gholson nor Scott has demonstrated that their housing assignment requires them to receive greater or different benefits under the consent decree than they have received.

3. Neither Gholson nor Scott has demonstrated that they have suffered any actual injury.

Defs.' Br.Supp.Mot.Summ.J. at 16. Plaintiffs failed to file any response to defendants' motion, so these facts are uncontroverted. Accordingly, Local Rule 10(F)(2) permits the court to assume that the above facts are admitted when determining defendants' Motion for Summary Judgment.

## A. *Claim # 1*

In their Complaint, plaintiffs allege former Head Director Murray and former Warden Thompson violated the Due Process Clause of the United States Constitution when they discontinued work opportunities and "closed down [the] school" for the plaintiffs and other segregation prisoners in Building Two, in violation of the terms of the Mecklenburg Consent Decree Settlement Agreement of April, 1985. *See* Attach. to Pls.' Questionnaire, Settlement Agreement [hereinafter "Consent Decree"]. When current Head Director Angelone and Warden Netherland took over, plaintiffs maintain they also allegedly violated plaintiffs' rights by failing to reinstate these programs. Although plaintiffs allege wrongdoing by Thompson and Netherland in the body of their original Complaint and in the amendment to the Complaint, this claim is only asserted against Murray and Angelone, because Thompson was dismissed as a defendant, and Netherland was never named as a defendant in this suit. Plaintiffs contend they are entitled to damages, declaratory relief in the form of an order stating that defendants violated the Consent Decree and plaintiffs' due process rights, and an injunction ordering defendants to furnish work opportunities, educational and vocational training, correspondence courses, and drug and alcohol counseling and treatment programs, as plaintiffs claim defendants are required to do under the Consent Decree.

Although plaintiffs' argument is not absolutely clear, they apparently maintain that defendants violated both their procedural and substantive due process rights when they deprived plaintiffs of access to work opportunities and educational programs. With regard to their claim of a substantive due process violation, "it is now well established that the Eighth Amendment 'serves as the primary source of substantive protection to convicted prisoners,' and the Due Process Clause affords a prisoner no greater *substantive* protection 'than does the Cruel and Unusual Punishments Clause.'" *Williams v. Benjamin*, 77 F.3d 756, 768 (4th Cir.1996) (emphasis in original) (quoting *Whitley v. Albers*, 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986)). Accordingly, the court will first consider plaintiffs' procedural due process claim, and then the Eighth Amendment claim.

### 1. *Procedural Due Process*

By denying plaintiffs access to work opportunities and educational programs required to be offered under the Consent Decree,

plaintiffs claim defendants Murray and Angelone violated their constitutional right not to be deprived of a protected liberty interest without due process of law. Plaintiffs are not entitled to the protections of the Due Process Clause unless they can demonstrate that the state has deprived them of a protected interest. *Sandin v. Conner,* —— U.S. ——, ——, 115 S.Ct. 2293, 2301, 132 L.Ed.2d 418 (1995).

In *Sandin,* a prisoner was placed in disciplinary segregation for thirty days after prison officials found him guilty of an infraction at a disciplinary proceeding. During the proceeding, he was refused the right to call witnesses. In his § 1983 claim, the prisoner contended that prison regulations, which allowed placement in disciplinary segregation only upon a finding of guilt, created a protected liberty interest in remaining in the general prison population. According to the prisoner, this protected liberty interest therefore required compliance with procedural due process, including the right to call witnesses at a disciplinary hearing.

Before *Sandin,* courts focused on whether the state statute or regulation was mandatory or discretionary in determining whether a protected liberty interest was created by that state action. *See Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983).[2] The *Sandin* Court rejected this analytical approach, and sought to refocus attention on the "nature of the deprivation." *Sandin,* —— U.S. at ——, 115 S.Ct. at 2299. The Court made clear that the liberty interests protected by the Due Process Clause are "generally limited to freedom from restraint which, while not exceeding the sentence in such as unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless *imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*" *Id.* at ——, 115 S.Ct. at 2300 (emphasis added).

Under this new standard, the Court concluded that the prisoner's placement in disciplinary segregation "did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Id.* at ——, 115 S.Ct. at 2301. Since prison officials had discretion to place prisoners in administrative segregation, and prisoners were faced with significant amounts of "lockdown time" even in the general population, the punishment was not "a dramatic departure from the basic conditions of [the prisoner's] indeterminate sentence" or "a major disruption in his environment." *Id.* at ——, 115 S.Ct. at 2301.

In *Williams v. Benjamin,* 77 F.3d 756, 768–70 (4th Cir.1996), the Fourth Circuit discussed the new standard under *Sandin.* In this case, the prisoner claimed his constitutional rights were violated when prison officials sprayed him with mace and confined him in four-point restraints on a bare-metal bed frame for more than eight hours. According to the court, the prisoner had a forceful argument that confinement in four-point restraints posed an atypical and significant hardship on him, since his "[t]otal immobilization in restraints surely 'work[ed] a major disruption in his environment.'" *Id.* at 769 (citing *Sandin,* —— U.S. at ——, 115 S.Ct. at 2301). The court declined to decide whether the prisoner had a protected liberty interest in freedom from four point restraints, however, because it noted that even if he did, he still could not establish a procedural due process violation for several reasons: (1) the prisoner did not argue what procedural protections were required; (2) process was not possible since the restraints were imposed in response to a disturbance; and (3) the prisoner failed to allege that his post-deprivation remedies were inadequate. *Id.* at 769–70.

With regard to the issue of whether inmates have a protected liberty interest in prison employment, one district court applying *Sandin* believed the Fourth Circuit would not find a protected liberty interest in retaining an acquired security classification and work release status. *See Knox v. Lanham,* 895 F.Supp. 750, 754 (D.Md.1995) (where practice was that participation in work release was required before inmates could obtain a parole recommendation, the

---

**2.** If the statute or regulation was mandatory, rather than discretionary, it created a liberty

interest. *Hewitt,* 459 U.S. at 467, 103 S.Ct. at 869.

court noted, without deciding the issue, that it was "inclined to believe that the Fourth Circuit, following *Sandin*, would hold that plaintiffs did not have a protected liberty interest in remaining in their classifications"). It is interesting to note that before *Sandin*, courts also did not find that any statute or regulation created a protected liberty interest in the provision of work opportunities and other means to earn good time credits. *See, e.g., Hewitt*, 459 U.S. at 467, 103 S.Ct. at 869. (holding that the due process clause does not create a liberty interest in earning a certain number of good time credits); *Gaston v. Taylor*, 946 F.2d 340, 344 (4th Cir.1991) (holding that the Virginia work release statute did not create a liberty interest); *Gibson v. McEvers*, 631 F.2d 95, 98 (7th Cir.1980) ("An inmate's expectation of keeping a certain prison job does not amount to a property or liberty interest entitled to protection under the due process clause."); *Altizer v. Paderick*, 569 F.2d 812, 813 (4th Cir.), *cert. denied*, 435 U.S. 1009, 98 S.Ct. 1882, 56 L.Ed.2d 391 (1978) (inmate was not denied any constitutional right by action of prison administrators in removing him, without a hearing, from assignment to the inmate advisor program, because "[c]lassifications and work assignments of prisoners in [state penal institutions] are matters of prison administration, within the discretion of prison administrators, and do not require fact-finding hearings as a prerequisite for the exercise of such discretion"); *Ewell v. Murray*, 813 F.Supp. 1180, 1183 (W.D.Va.1993) ("Neither DOP 806 nor the Virginia Code creates a liberty interest in being placed in any particular [good conduct allowance classification] or in earning any particular number of credits.").

In this case, plaintiffs argue that their due process rights were violated because defendants were required to provide them with work opportunities and certain educational programs under the Consent Decree, Virginia Code § 53.1, and Virginia Department of Corrections Division of Adult Institutions Operating Procedure (DOP) 806. Paragraph 13 of the Consent Decree provides that:

> The [Virginia Department of Corrections ("DOC")] will develop a plan to provide the opportunity to all inmates, except those in isolation and pre-hearing detention, for programming similar to other maximum security prisons in Virginia. Among the basic programs to be considered are: work, correspondence courses, educational and vocational training programs, psychological counseling, alcohol and drug treatment, program counseling, and religious programs. The DOC will provide a detailed plan for all programming in place or being considered ... [and this] plan will set forth reasonable starting dates for the various programs.

Consent Decree ¶ 13. According to Virginia Code § 53.1–200, inmates must participate in an appropriate educational, training, work, counseling, or substance abuse program, or other programs intended for rehabilitation, as a condition for earning a good conduct allowance. DOP 806 establishes the policies and procedures for awarding good conduct allowance credits to inmates. Plaintiffs claim they must be provided opportunities to work and attend educational training so they can earn these good conduct allowance credits.

■ In effect, plaintiffs claim that the Consent Decree, Virginia Code § 53.1–200, and DOP 806 provide them with a protected liberty interest in having access to work opportunities and certain educational programs, of which they cannot be deprived without due process. However, the court declines to find a procedural due process violation. First of all, the Consent Decree, the Mecklenburg Program Plan ("the Plan"), the Virginia Code, and DOP 806 do not provide plaintiffs with a protected liberty interest. Plaintiffs must show that deprivation of work opportunities and certain educational programs imposed an "atypical and significant hardship on [plaintiffs, who are segregation inmates,] in relation to the ordinary incidents of prison life." *Sandin*, —— U.S. at ——, 115 S.Ct. at 2300. Plaintiffs have provided no evidence in support of this argument. Second, even if the court assumed that plaintiffs have a protected liberty interest, they have not stated what procedural protections were specifically required before the programs were discontinued, nor are there any allegations or evidence that plaintiffs did not receive all the process they were due.

According to Carl Hester, Assistant Warden of Programs, the Plan was implemented pursuant to the Consent Decree. The Plan states that any of the programs provided at Mecklenburg can be added, modified, or deleted as time and events dictate. Hester Aff. ¶ 12. Defendants also note that the Plan permits them to treat inmates in segregation housing differently than the other prisoners in the general population. Under the Plan, Building Two was designated as the segregation building to house disruptive, aggressive, violent, and/or protective custody inmates assigned to long term segregation. Most of the inmates housed in Building Two were problem inmates, with histories of assaults on staff members, escape, hostile behavior, and hostage taking. *Id.* ¶ 10, 12. Hester explains that the inmates in Building Two "demonstrated that they do not have the internal controls to be allowed the privileges of any of the other buildings and programs available at Mecklenburg." *Id.* ¶ 12. Plaintiffs Gholson and Scott have admitted, via defendants' uncontroverted statement of undisputed facts, that they were placed in Building Two segregation housing at Mecklenburg because of their "maladjustment and behavioral problems" and because they "are disruptive, hostile, aggressive, and assaultive, with lengthy histories of major institutional infractions." Defs.' Br.Supp.Mot.Summ.J. at 16. A review of the copies of the relevant major incident reports for Gholson and Scott confirms this fact. Hester Aff. ¶ 6–7, Ex. A–B.

Before Spring, 1994, Mecklenburg offered work opportunities to inmates in Building Two. Prison officials had problems controlling contraband in that building, however, because non-employed inmates threatened and intimidated the employed inmates into distributing contraband. Consequently, for security reasons and because the safety of the employed inmates was threatened, in Spring, 1994, Warden Thompson eliminated the jobs in Building Two. *Id.* ¶ 11. It is unclear how plaintiffs were injured by this deprivation of work opportunities, as it is undisputed that defendants have no record of Gholson or Scott ever applying for or holding a job in Building Two before the jobs were eliminated.[3] *Id.* ¶ 13. Furthermore, plaintiffs could not expect that jobs would always be available, because "[n]either the Program Plan nor the Mecklenburg Consent Decree required that the inmates in [plaintiffs' building] be provided the opportunity for jobs. Paragraph 13 of the Consent Decree merely mentions that 'work' is among the basic programs to be considered." *Id.* ¶ 12. Plaintiffs do not dispute this fact, nor defendants' assertion that any of the programs provided at Mecklenburg can be added, modified, or deleted as time and events dictate, such as for security reasons. *Id.*

With regard to the educational programs, plaintiffs make the conclusory allegation that defendants "closed down" the school in Building Two, and deprived plaintiffs access to educational and vocational programs, including correspondence courses. Plaintiffs do not specify how they were deprived of educational and vocational training, nor do they offer any evidence to support their allegations. The record shows that educational and vocational training was available to plaintiffs at Mecklenburg. In his affidavit, Assistant Warden Hester explains that the school in Building Two was never completely closed, and plaintiffs do not dispute this fact. Hester notes that the school was only closed periodically, when all out-of-cell activities for the segregation inmates, including educational programs, were temporarily curtailed to allow the completion of security-related activities such as searches or lockdowns. *Id.* In addition, plaintiffs admit in their Complaint that Mecklenburg offered educational opportunities such as the Graduate Equivalency Degree (GED) and Adult Basic Education (ABE) courses to all general population and segregation inmates. Compl. ¶ 6; Hester Aff. ¶ 14. It is not disputed that Mecklenburg offers counseling, psychiatric, and chaplain services, and that religious volunteers have access to all inmates. Hester Aff. ¶ 8–9.

The record shows that defendants fairly deprived plaintiffs of access to certain edu-

---

**3.** Gholson did apply for a job as an academic aid or tutor in June, 1995, but his application was denied due to his segregation status and his unruly behavior. *Id.* ¶ 13.

cational programs because of their status as segregation inmates, or due to their poor behavior. In April, 1994, Gholson attempted to enroll in community college courses. The Mecklenburg administration explained to him that these courses were unavailable to segregation inmates, but they encouraged him to enroll in correspondence college courses available through the mail. *Id.* ¶ 15. Scott requested enrollment in the GED program in April, 1994. He does not dispute that this request was denied due to his unruly behavior. According to prison policy, an inmate must exhibit ninety (90) days of infraction-free behavior before becoming eligible to apply for educational courses. In April, 1996, Scott's name was added to the waiting list for the ABE program. *Id.* ¶ 16. Thus, the evidence shows that plaintiffs had access to some educational and vocational programs at Mecklenburg, and when they were unable to obtain a certain type of education they desired, defendants had good reason to deny access to that educational program.

Accordingly, defendants' deprivation of work opportunities and some educational programs did not impose an "atypical and significant hardship on [plaintiffs] in relation to the ordinary incidents of prison life." *Sandin,* —— U.S. at ——, 115 S.Ct. at 2300. This case is very different from *Williams,* 77 F.3d at 769, where the Fourth Circuit noted, without deciding the issue, that it thought confinement for more than eight hours in four-point restraints posed an atypical and significant hardship on an inmate. Contrary to that inmate's total immobilization for eight hours, plaintiffs Gholson and Scott did not suffer "a dramatic departure from the basic conditions of [their] indeterminate sentence" or "a major disruption in [their] environment." *Sandin,* —— U.S. at ——, 115 S.Ct. at 2301. Rather, they were deprived of access to work opportunities and certain educational programs because they were "disruptive, hostile, aggressive, and assaultive" inmates assigned to segregation housing. Segregation inmates were not entitled to participate in all the programming available to the general population because they posed a higher security risk. "[F]ederal courts ought to afford appropriate deference and flexibility to state officials trying to manage a vola-

tile environment.... Such flexibility is especially warranted in the finetuning of the ordinary incidents of prison life...." *Id.* at ——, 115 S.Ct. at 2299. Although prisoners do not shed all of their constitutional rights at the prison gate, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* at ——, 115 S.Ct. at 2301 (citations omitted). In addition, defendants' undisputed contentions are correct; "[n]either Gholson nor Scott has demonstrated that their housing assignment requires them to receive greater or different benefits under the consent decree than they have received," and "[n]either Gholson nor Scott has demonstrated that they have suffered any actual injury." Defs.' Br. Supp.Mot.Summ.J. at 16.

Since defendants' conduct did not impose an "atypical and significant hardship on [plaintiffs] in relation to the ordinary incidents of prison life," plaintiffs did not have a protected liberty interest in access to work opportunities and educational programs. Therefore, plaintiffs are not entitled to the procedural protections of the Due Process Clause. Even if plaintiffs did have such a liberty interest, however, they have not suggested what sort of procedural protections were required. Furthermore, there is nothing in this record to suggest that plaintiffs did not receive all the process that they were due. There is no evidence that prison officials failed to follow proper procedures with regard to the individual plaintiffs, nor is there evidence that prison officials did not properly promulgate or apply any prison rules and regulations. Thus, there was no violation of plaintiffs' right to procedural due process when defendants deprived them of work opportunities and certain educational programs.

### 2. Eighth Amendment

■ Courts use the Eighth Amendment to scrutinize the treatment a prisoner receives in prison and the conditions of confinement. To prove cruel and unusual punishment in violation of the Eighth Amendment, plaintiffs must satisfy a two-prong test that

has both an objective and a subjective component. The first prong, which is an objective inquiry, asks whether the deprivation alleged is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 1973, 128 L.Ed.2d 811 (1994); *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 2323–24, 115 L.Ed.2d 271 (1991). The inmate must be denied "the minimal civilized measure of life's necessities," *Wilson*, 501 U.S. at 298, 111 S.Ct. at 2324, and the deprivation must violate contemporary notions of decency. *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (although the conditions may be restrictive and even harsh, they are part of the penalty that criminal defendants must pay for their offenses against society).

 The second prong, a subjective inquiry, requires the inmate to demonstrate that the prison officials acted at least with deliberate indifference toward his or her needs. *Farmer*, 511 U.S. at 834, 114 S.Ct. at 1973; *Wilson*, 501 U.S. at 302–303, 111 S.Ct. at 2326–2327. This subjective prong requires more than negligent conduct; deliberate indifference exists when a prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 835–37, 114 S.Ct. at 1979 (establishing a subjective recklessness standard for prison-condition cases); *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986). In addition, plaintiffs must produce evidence of serious or significant physical or emotional injury resulting from the challenged cruel and unusual prison conditions to withstand summary judgment on a prison conditions claim. *Strickler v. Waters*, 989 F.2d 1375, 1380–81 (4th Cir.), *cert. denied*, 510 U.S. 949, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993).

 First of all, plaintiffs have failed to satisfy the objective prong of the Eighth Amendment test. When defendants denied plaintiffs access to work opportunities and certain educational programs, this was clearly not a "sufficiently serious" deprivation of "the minimal civilized measure of life's necessities." Because segregation inmates pose a higher security risk, they clearly cannot participate in all of the programs available to the general prison population. Moreover, outside of prison, there is no guarantee of employment nor a right to certain types of education, such as college, free-of-charge. Thus, it is unlikely that contemporary society would find the deprivation to segregation inmates of work opportunities and certain types of education to be cruel and unusual punishment. In addition, there are no allegations or evidence of serious or significant physical or emotional injury resulting from the challenged "cruel and unusual prison conditions." Rather, plaintiffs have admitted that they have suffered no actual injury by failing to oppose defendants' statement of undisputed facts. Since plaintiffs have failed to provide any evidence that they suffered a serious or significant injury, or a "sufficiently serious" deprivation of "the minimal civilized measure of life's necessities," the court need not address the second prong of the Eighth Amendment test. Accordingly, the court grants defendants summary judgment on Claim # 1 because there is no evidence that defendants Murray and Angelone violated plaintiffs' procedural due process rights or their rights under the Eighth Amendment.

*B. Claim # 2*

Plaintiffs claim that Ms. Dunn, Head of Food Service at Mecklenburg, violated their rights under the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act of 1993 by preparing and serving food in a manner that does not comply with the Consent Decree, the book *How to Eat to Live*, and the teachings of the Nation of Islam. The Consent Decree provides, *inter alia*, that pork products must be served with "separate utensils." Consent Decree ¶ 19. Plaintiffs contend they informed Dunn that pork products must also be served on separate plates, but she continued to serve meals to non-pork-eating prisoners on the same plates as the pork-eating prisoners. In addition, plaintiffs allege Dunn served them pinto, kidney, and lima beans, rather than baby navy beans, when the latter is the only type of bean acceptable according to the book *How to Eat to Live*. Plaintiffs request damages from Dunn, declaratory relief stating that Dunn violated the Consent

Decree, and an injunction ordering Dunn to prepare and serve food in accordance with the teachings of the Nation of Islam.

Dunn was dismissed from this suit when plaintiffs omitted her as a defendant in their amendment to the Complaint. In this portion of the Complaint, plaintiffs have failed to allege any involvement by the remaining defendants, Murray, Angelone, Hester, or Bruce, either by proper name or title. Accordingly, because this claim is not asserted against any of the defendants, in their individual or their official capacities, summary judgment for defendants is granted on Claim #2.

## C. Claim #3

Plaintiffs claim defendant Angelone[4] improperly denied their requests for a transfer to Buckingham Correctional Center, and thus denied them a proper religious diet, because Buckingham is the only Virginia Department of Corrections institution that serves the Nation of Islam diet. During an Institutional Classification Committee (ICC) hearing at Mecklenburg on October 18, 1994, Gholson stated he wanted a transfer to Buckingham to obtain a religious diet. ICC refused his request because Gholson "continued to exhibit disruptive behavior and a transfer would not be considered for him until his behavior improved." Hester Aff. ¶ 21. Although Gholson mentioned at later ICC hearings that he would like to transfer to Buckingham, ICC reports indicate that he did not specifically indicate he wanted a transfer to participate in a religious diet. *Id.* 21, Ex. C. At numerous ICC hearings, Scott also indicated that he wanted to transfer from Mecklenburg to Buckingham, or another institution. Defendants note, however, that ICC reports show he never stated he wanted a transfer to Buckingham to participate in a religious diet. *Id.* 22–23; Ex.D.

By denying plaintiffs' request for a transfer to Buckingham, and allegedly depriving them of a proper religious diet, plaintiffs claim defendant Angelone violated their

rights under the Free Exercise Clause of the First Amendment, the Religious Freedom Restoration Act of 1993 (RFRA), the Equal Protection Clause, and the Eighth Amendment. Plaintiffs seek damages, a declaration by the court stating that defendants violated the constitution when they denied plaintiffs' transfer to Buckingham, and an injunction ordering defendants to transfer plaintiffs to Buckingham.

### 1. Free Exercise Clause and RFRA

■ The Free Exercise Clause of the First Amendment, which applies to the states through the Fourteenth Amendment, provides that "Congress shall make no law ... prohibiting the free exercise of religion." U.S. Const. amend. I. The Religious Freedom Restoration Act ("RFRA"), which became effective November 16, 1993, mandates that prison officials shall not "substantially burden a person's exercise of religion" unless the prison officials can demonstrate that the burden furthers a "compelling governmental interest" by the "least restrictive means." 42 U.S.C. § 2000bb–1. Before RFRA was passed by Congress, the Supreme Court held that a prisoner's desire to practice religion may be restricted only upon a showing that the restriction is reasonably related to legitimate penological interests. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 2404–05, 96 L.Ed.2d 282 (1987) (prison policy precluding outdoor workers from returning to prison worship services during day was reasonably related to legitimate penological interests).

Plaintiffs have failed to put forth any evidence suggesting that Angelone or any other prison official "substantially burdened" their exercise of religion, specifically their right to practice their religious diet. Although plaintiffs maintain that they can only obtain a proper religious diet at Buckingham, they have presented no evidence to support their general and conclusory allegations that they have not received a proper religious diet at Mecklenburg. The only specific allegations

---

**4.** Plaintiffs also named Thompson and Netherland in this portion of their Complaint alleging improper denial of a request for transfer and failure to provide a religious diet. As stated previously, Thompson was dismissed as a defendant, and Netherland was never named a defendant in this case.

in their entire Complaint regarding their deprivation of a proper religious diet at Mecklenburg are that Dunn served meals to non-pork-eating prisoners on the same plates as the pork-eating prisoners, and served pinto, kidney, and lima beans, rather than baby navy beans, in violation of the teachings of *How to Eat to Live*. This case is before the court on defendants' Motion for Summary Judgment, and plaintiffs have proffered no evidence, in the form of affidavits or otherwise, to support these claims.

On the other hand, the record supports defendants' contention that Mecklenburg has served plaintiffs and the other inmates a proper religious diet. According to the Consent Decree,

> The DOC agrees to make available dietary substitution for Nation of Islam prisoners that satisfy minimum nutritional needs and are consistent with the teachings of *How to Eat to Live*. Separate utensils shall be used for pork products. Such materials shall never be used for the serving of non-pork products. The DOC will continue to assure the noncontamination by pork of the meals of non-pork eaters. Upon request, a Nation of Islam consultant may inspect the facilities and methods in the food preparation area at [Mecklenburg.]

Consent Decree ¶ 19. Assistant Warden Hester explains in detail how Mecklenburg provides a religious diet that satisfies minimum nutritional needs and that is consistent with the teachings of *How to Eat to Live:*

> [t]he Department of Corrections offers a twenty-eight day master menu which includes vegetarian diet substitutes and is consistent with the teachings of How to Eat to Live as suggested by the Nation of Islam. To ensure that the inmates in segregation are receiving their diet choices, each inmate is given a seven day menu in which the inmate is permitted to circle his meal choices for the week.

Hester Aff. ¶ 17.

For inmates assigned to segregation housing, the Consent Decree provides that Mecklenburg will serve inmates their meals in their cells. *Id.* ¶ 18; Consent Decree ¶ 10. Hester explains that:

> segregation inmates in [Building Two] were served their meals on trays that were prepared by staff from a mobile serving cart with warmers which was transported to [Building Two]. The trays were prepared and covered with plastic wrap[, and] then delivered to the inmates through the tray slot on their cell doors. The inmates were given disposable plastic utensils for each meal. After meals, the trays were collected and taken to the kitchen where they were washed and sterilized.

Hester Aff. ¶ 18. Plaintiffs do not dispute that Mecklenburg

> uses separate utensils for preparation and serving of meals. Mecklenburg uses a separate set of utensils to serve pork products. The same utensils are not used for the serving of non-pork products. This facility does not serve the inmate meals on plates.

*Id.* ¶ 19.

Plaintiffs have offered no evidence to contradict defendants' contention that Mecklenburg provides a religious diet consistent with the teachings of *How to Eat to Live* as suggested by the Nation of Islam. Thus, Angelone and the other prison officials at Mecklenburg did not "substantially burden" plaintiffs' exercise of religion when plaintiffs' requests for a transfer to Buckingham were denied. Furthermore, defendants note that it is the Central Classification Board who makes the final decision on transfers:

> [a]lthough Buckingham offers Kosher meals for Jewish inmates, the transfer of an inmate to another facility to allow him to participate in a religious diet is not a decision in which the Warden has final approval. The Warden is responsible for reviewing Institutional Classification Committee (ICC) recommendations but all institutional transfer recommendations require final approval by the Central Classification Board (CCB).

*Id.* ¶ 20. Thus, Angelone did not violate plaintiffs' rights under the First Amendment or RFRA.

*2. Equal Protection*

 Plaintiffs also claim a violation of their equal protection rights. An equal pro-

tection claim arises when a governmental entity treats similarly situated persons differently without adequate justification. U.S. Const. amend. XIV. Prison regulations that discriminate among inmates generally only need survive rational basis review because prisoners are not in a protected class. *See Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (reasonableness standard applies whenever needs of prison administration implicate constitutional rights). Thus, there is no equal protection violation if the challenged regulation that results in unequal treatment serves a legitimate state interest and is rationally related to that interest. *McGinnis v. Royster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 1059–60, 35 L.Ed.2d 282 (1973). Where the classification infringes upon some fundamental constitutional right or is based upon a suspect criterion, such as race or national origin, however, the court will use strict scrutiny for these classifications. *Id.*

■ Although plaintiffs claim their equal protection rights were violated when they were denied a transfer to Buckingham, plaintiffs have not alleged any facts to support their contention that they received disparate treatment when compared with a "similarly situated" individual. If plaintiffs are arguing that inmates of other religious faiths were provided a proper religious diet when they were not, as noted above, there is no evidence plaintiffs failed to receive a proper religious diet at Mecklenburg. Although plaintiffs' requests for a transfer were denied, they have provided no evidence to show they were treated differently than other similarly situated inmates. The mere allegation that plaintiffs were denied a transfer to an institution that serves their religious diet does not state an equal protection claim. *Cf. Paoli v. Lally,* 812 F.2d 1489 (4th Cir.), *cert. denied,* 484 U.S. 864, 108 S.Ct. 184, 98 L.Ed.2d 137 (1987) (finding that inmates did not state an equal protection claim when the commissioner removed the inmate from a minimum security facility and denied subsequent transfer recommendations, considering the inmate's extreme sentence). Thus, plaintiffs equal protection claim fails.

### 3. Eighth Amendment

■ Plaintiffs also claim defendants violated the Eighth Amendment's prohibition against cruel and unusual punishment. To succeed on their claim of cruel and unusual punishment, plaintiffs must prove: (1) that the injuries they suffered were "sufficiently serious" to invoke the Constitution, and (2) that defendants acted with "deliberate indifference" when they refused to transfer plaintiffs to Buckingham, where they could obtain a proper religious diet. *See Farmer,* 511 U.S. at 834, 114 S.Ct. at 1973; *Wilson,* 501 U.S. at 297–98, 111 S.Ct. at 2323–24. As noted above, plaintiffs did not offer any evidence that defendants' refusal to transfer them to Buckingham was "sufficiently serious," because plaintiffs were provided with a proper religious diet at Mecklenburg. In addition, plaintiffs have failed to produce evidence of serious or significant physical or emotional injury resulting from defendants' failure to transfer them to Buckingham, or from the religious diet that plaintiffs received at Mecklenburg. *Strickler,* 989 F.2d at 1380–81. Accordingly, defendants did not violate the Eighth Amendment when they refused to transfer plaintiffs to Buckingham. The court therefore grants defendants summary judgment on Claim #3 of plaintiffs' Complaint.

### D. Claim #4

Plaintiffs allege that Angelone and Netherland violated their constitutional rights by building inadequate new outdoor recreational facilities, which are too small, and which lack water and restrooms. As noted previously, Netherland is not a defendant in this case. Plaintiffs claim that in April, 1994, Angelone "tore down all the basketball goals in [the] segregation buildings and erected several '5 × 6' dog cages for each individual to get their outside recreation in their own separate cage." Plaintiffs allege this violates the Eighth Amendment, because these cages are not large enough for exercise. Although they allege no present injury, plaintiffs claim these inadequate exercise facilities will result in physical and mental deterioration. Plaintiffs also claim that the segregation prisoners at Mecklenburg have been singled out for

punishment in violation of the Equal Protection Clause, and that even prisoners on death row have better exercise facilities. Plaintiffs seek damages, declaratory relief stating that defendants violated the constitution when they constructed these cages and failed to provide water or restrooms, and an injunction ordering defendants to take down the cages and put back the old facilities.

### 1. Eighth Amendment

As stated previously, to succeed on their claim of cruel and unusual punishment, plaintiffs must prove: (1) that the injuries they suffered were "sufficiently serious" to invoke the Constitution, and (2) that defendants acted with "deliberate indifference" when they built these recreational facilities for the segregation inmates. *See Farmer*, 511 U.S. at 834, 114 S.Ct. at 1973; *Wilson*, 501 U.S. at 297–98, 111 S.Ct. at 2323–24. Under the Eighth Amendment, a prison official is liable for denying an inmate humane conditions of confinement if that prison official

> knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.... [A]n official's failure to alleviate a significant risk that he should have perceived but did not ... cannot ... be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837–38, 114 S.Ct. at 1979.

Denial of out-of-cell exercise for an extended period of time violates the Eighth Amendment, absent exceptional circumstances. *Mitchell v. Rice*, 954 F.2d 187 (4th Cir.), *cert. denied*, 506 U.S. 905, 113 S.Ct. 299, 121 L.Ed.2d 222 (1992). In *Sweet v. South Carolina Department of Corrections*, 529 F.2d 854, 865–66 (4th Cir.1975), the Fourth Circuit found cruel and usual punishment where inmates were restricted to two one-hour exercise periods over an extended period of years, if the plaintiff could prove this indefinite limitation on exercise was harmful to his health. The Fourth Circuit found there was no Eighth Amendment viola-

tion, however, where inmates had access to an indoor day room for eighteen hours per day and were encouraged to use this room for exercise and physical activity. *Clay v. Miller*, 626 F.2d 345, 347 (4th Cir.1980).

In this case, plaintiffs make the conclusory statement that they will suffer physical and mental deterioration due to the fact that the new outdoor recreational facilities for segregation prisoners are cruel and unusual punishment. Although plaintiffs claim the "'5 × 6' dog cages" are too small, and that inmates do not have access to water or restrooms, the record shows that

> [t]he individual recreation areas are approximately 8' × 20' feet fenced-in areas and were constructed on the former basketball court area. The basketball goals were removed because a more secure and controlled recreation area for segregation inmates became necessary. Inmates assigned to segregation at Mecklenburg receive a minimum of six hours of recreation each week.... The inmates in segregation are therefore allowed outside to recreate in the individual recreation areas for two hours, three times each week. Water is provided to inmates upon request. For security reasons, inmates are not allowed out of their recreation area to use the restroom until the recreation period is concluded. The inmates may either use the restroom in their cells before recreation or afterward.

Hester Aff. ¶ 32. The record shows that plaintiffs have at least six hours of outside recreation per week. Although plaintiffs have alleged these individual recreation areas are too small, they have not presented any evidence suggesting that they cannot adequately exercise within the area provided. Thus, deprivation of a larger exercise area or of access to restrooms during the two hour exercise period is not "sufficiently serious." Although plaintiffs may believe they are entitled under the Constitution to a larger exercise area with restrooms and water fountains, "inadequate exercise facilities is not another name for unconstitutional exercise facilities, i.e., cruel and unusual punishment." *Sellers v. Roper*, 554 F.Supp. 202, 208 (E.D.Va.1982).

Thus, plaintiffs have not stated a sufficient Eighth Amendment claim.

### 2. Equal Protection

██ Plaintiffs also claim a violation of their equal protection rights. By providing these small, inadequate exercise facilities to segregation inmates, and not to more dangerous inmates on death-row in other correctional facilities, plaintiffs claim that prison officials have treated similarly situated persons differently without adequate justification. Under rational basis review, there is no equal protection violation here. Although the segregation inmates at Mecklenburg may have smaller outdoor exercise recreational facilities compared to other inmates, defendants only have to prove that their actions are rationally related to a legitimate state interest. *McGinnis v. Royster*, 410 U.S. 263, 270, 93 S.Ct. 1055, 1059–60, 35 L.Ed.2d 282 (1973). Defendants clearly have a legitimate state interest in security and safety at Mecklenburg. As Hester noted in his affidavit, the basketball goals were removed, and the individual recreational facilities were erected, "because a more secure and controlled recreation area for segregation inmates became necessary." Hester Aff. ¶ 32. In addition, inmates are not allowed out of their recreation area to use the restroom until the recreation period is concluded "[f]or security reasons." *Id.* When defendants erected the new individual recreational facilities, this was clearly rationally related to the legitimate state interests of security and safety. Thus, plaintiffs' equal protection claim fails, and defendants are entitled to summary judgment on Claim # 4.

### E. Claim # 5

Plaintiffs allege defendants Murray and Angelone failed to protect the health and safety of inmates by exposing them to water contaminated with lead. Thompson was also included in this claim, but, as noted previously, he was dismissed from the case. In 1993, Thompson circulated a memorandum at Mecklenburg regarding the high content of lead in the water and the health risks in consuming that water. Plaintiffs allege that the prisoners in Building Two were never warned about this lead contamination, and they were not given an alternative water source. By failing to provide plaintiffs with an alternative lead-free water source, plaintiffs claim Murray and Angelone did not protect the health and safety of plaintiffs and the other inmates. Plaintiffs seek damages, declaratory relief stating that defendants knew about the lead contamination but refused to make any serious attempts to protect inmate health and safety, and an injunction ordering defendants to make a serious effort to protect prisoner health and safety, such as by providing another water source for the inmates until the water system is fixed.

██ For an Eighth Amendment claim based on failure by prison officials to prevent harm, plaintiffs must show: (1) exposure to a "sufficiently substantial" and "unreasonable risk of serious damage to [their] future health," and (2) that prison officials acted with "deliberate indifference" to that risk. *Helling v. McKinney*, 509 U.S. 25, 35–36, 113 S.Ct. 2475, 2481–82, 125 L.Ed.2d 22 (1993); *see also Farmer*, 511 U.S. at 834, 114 S.Ct. at 1973; *Wilson*, 501 U.S. at 297–98, 111 S.Ct. at 2323–24. Although an inmate may prove that prison officials actually knew of a substantial risk to inmate health or safety, the court may find the officials are not "deliberately indifferent" if they responded reasonably to the risk, even if the harm ultimately was not averted. *Farmer*, 511 U.S. at 844, 114 S.Ct. at 1983.

In *Helling*, an inmate brought an action under § 1983 against prison officials challenging his assignment to a cell with an inmate who smoked five packs of cigarettes per day. The Supreme Court held that the plaintiff stated a cause of action under the Eighth Amendment by alleging that the prison officials, with deliberate indifference, exposed him to unreasonably high levels of secondary environmental tobacco smoke posing "an unreasonable risk of serious damage to his future health." *Helling*, 509 U.S. at 35, 113 S.Ct. at 2481. The Court noted that to state an Eighth Amendment claim, the plaintiff must also prove (1) unreasonably high levels of exposure to the harm; (2) scientific and statistical evidence establishes the likelihood that such exposure will cause

injury to the inmate's health; and (3) the risk of harm is so grave that it "violates contemporary standards of decency to expose *anyone* unwillingly to such a risk[;] ... the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Id.* at 36, 113 S.Ct. at 2482.

In *McNeil v. Lane*, 16 F.3d 123 (7th Cir. 1995), an inmate alleged he was exposed to asbestos-covered pipes directly outside his cell for over ten months. Because the complaint did not allege facts sufficient to establish that he was exposed to an unreasonably high level of asbestos, the court held that he did not state a cognizable Eighth Amendment claim. *Id.* at 125.

▮▮▮ Defendants admit that there is an ongoing problem with lead in the water at Mecklenburg. The record shows, however, that they have not been "deliberately indifferent" of the risks to inmate health and safety. Rather, they have reasonably responded to this problem by reviewing the situation "intensely" and by informing the staff and inmates of the steps they need to take to safeguard themselves from exposure. Hester Aff. ¶ 27. For example, staff and inmates were told to allow water to run for fifteen to thirty seconds before consumption, and not to consume hot water from the tap. Hester notes that the Environmental Protection Agency has advised him that this procedure is safe for both staff and inmates. *Id.* ¶ 27, Ex.E. Furthermore, while it is undisputed that lead has dissolved into the water through the Mecklenburg plumbing, there is no evidence that plaintiffs' present or future health has been injured.[5] Thus, plaintiffs' Eighth Amendment claim fails, and defendants are entitled to summary judgment on Claim # 5.

### F. Claim # 6

Plaintiffs complain that defendants should leave open the tray slots in the inmates' cell doors to provide adequate ventilation, even though plaintiffs admit that ten percent of the inmates "abuse the tray slots." In this portion of the Complaint, plaintiffs do not allege which of the defendants is responsible, but they claim that someone violated their constitutional rights by keeping the tray slots closed and not providing adequate ventilation. Defendants note that the purpose of the tray slots is to provide a place where an inmate's food tray can be served to him. Hester notes that in his experience, inmates in Building Two "used every opportunity to assault staff including throwing objects through the tray slots. Therefore, the tray slots remained locked and were only opened for meals." Hester Aff. ¶ 33. According to Scott's incident reports, he has been charged with committing such assaults on staff on several occasions. *Id.* ¶ 33, Ex.A.

▮▮▮ Inadequate heating and ventilation, or unsanitary living conditions, may reach a level of cruel and unusual punishment if they cause (1) sufficiently serious deprivation (2) to which prison officials are deliberately indifferent. *Farmer*, 511 U.S. at 834, 114 S.Ct. at 1973; *Wilson*, 501 U.S. at 297–98, 111 S.Ct. at 2323–24. In *Shrader v. White*, 761 F.2d 975 (4th Cir.1985), the Fourth Circuit did not find cruel and unusual punishment where the inmate's living conditions included leaking ceilings, pigeons sometimes nesting in the building, occasional mold in showers, old buildings, and a single exit from the cellhouse.

▮▮▮ Even if plaintiffs alleged that a specific defendant violated their constitutional rights by failing to keep the tray slots open, they have presented no evidence to support their conclusory allegations that they were not provided with other adequate ventilation.

---

**5.** According to the medical records custodian at Augusta Correctional Center, Ms. Whitlock, Gholson's medical records show that he requested a test for lead poisoning on March 28, 1994. On March 29, 1994, the Mecklenburg doctor reported that he saw no symptoms of lead poisoning and told Gholson that the test was not needed. Gholson again voiced his concerns about lead in the water to Mecklenburg medical staff on April 7, 1994, and May 10, 1994. On May 11, 1994, the staff noted in Gholson's medical record that they saw no reason to order a lead level test. Hester Aff. ¶ 25. According to Mecklenburg Head Nurse Whetherbee, Scott's medical records show he only complained about the lead in the water once, on April 1, 1996. At that time, the doctor saw no need for medical treatment. *Id.* ¶ 26.

■ the contrary, the record supports defendants' contention that segregation inmates were provided with adequate ventilation in light of security concerns. In his affidavit, Hester explains that

> Building [Two] is equipped with wall mounted oscillating fans and a built in ventilation exhaust system. Building [Two] contains one air handler in each pod for a total of three handlers. The handlers provide a steady flow of air through the units and provide heat during the winter months. Each inmate has a vent in their cell through which air flows from the system. The air handlers are inspected by a contractor quarterly to ensure that they are working properly. [Although this twenty-year old facility is not air conditioned,] each cell has a window that the inmates are allowed to open by requesting the window crank from security staff. Recently, the state issued fans, with metal shafts, were removed from the inmate population because the inmates were making weapons from the fan shafts. The Commonwealth purchased new fans which have smaller shafts and the inmates who had the old fans taken from them were given new fans. The new fans can now be purchased at the prison commissary.

Hester Aff. 34. Thus, plaintiffs do not have a claim for cruel and unusual punishment, as they have not proved they suffered a sufficiently serious deprivation nor that defendants were deliberately indifferent to their needs for ventilation. Accordingly, defendants are entitled to summary judgment on Claim # 6 of plaintiffs' Complaint.

### G. Claim # 7

Plaintiffs finally claim that defendants Angelone, Hester, and Bruce violated the Consent Decree and their constitutional rights by reinstating a "phase program," because Mecklenburg agreed to "eliminate" the phase program and not reinstate it in the Consent Decree. Plaintiffs seek damages and an injunction ordering defendants to eliminate the current phase program and permit inmates to transfer from Mecklenburg to other correctional institutions.

According to plaintiffs, under the "old phase program," prisoners were sent to Mecklenburg to participate in several work, educational, and vocational programs. They were allowed to interact with other prisoners in the "pod area." After nine months to a year, if the prisoner had shown improvement, he was transferred to another facility. Plaintiffs claim defendants agreed to "eliminate" this phase program in the Consent Decree. The language in the Consent Decree provides:

> The DOC has discontinued the phase program and does not intend to reinstate any similar program in the future. If in the future a similar program is considered by the DOC, before any such program is initiated, the Court and all counsel of record in this litigation will be notified by the DOC. This notice shall be in writing and shall include a detailed description of the proposed program. All counsel of record will have 60 days from the receipt of said notice to file written comments with the DOC or to take any appropriate action with the Court.

Consent Decree ¶ 1.

Plaintiffs claim defendants' current practice, their "new phase program," is worse than the "old phase program." According to plaintiffs, Mecklenburg currently only houses segregation prisoners, so it does not have a general population. The only way for a prisoner to get into the general population is to obtain a transfer to another prison, but, according to plaintiffs, few Mecklenburg prisoners have been granted a transfer, regardless of good behavior. For example, plaintiffs claim that when the Institutional Classification Committee (ICC) allegedly recommended plaintiff Scott for a transfer, the transfer was denied by the Central Classification Board (CCB) at the Head Office of the Department of Corrections, even though ICC is more aware of a prisoner's behavior and improvement than CCB.

Plaintiffs note that segregation is difficult for inmates, because the prisoners spend most of the time in their cells, and indicate they would like to be transferred to another institution so they could be housed in the general population. Plaintiffs claim defen-

dants personally dislike certain prisoners based on their race, religion, or political beliefs, but they offer no specific evidence to support this allegation, nor do they allege that defendants denied plaintiffs their transfers for discriminatory reasons. Plaintiffs only contend that the new phase program violates their due process rights because it does not allow them to transfer to another institution or live in the general population.

■ Under *Sandin*, ⸺ U.S. at ⸺, 115 S.Ct. at 2300, the Due Process Clause only protects those punishments and deprivations that "impose atypical and significant hardship on [inmates] in relation to" ordinary prison life. When an inmate is deprived of a transfer to another institution or of access to the general prison population, this does not "impose atypical and significant hardship on [the inmate] in relation to" ordinary prison life. *See Sandin*, ⸺ U.S. at ⸺, 115 S.Ct. at 2300 (placement in disciplinary segregation did not create a liberty interest); *Garrett v. Angelone*, 940 F.Supp. 933, 943 (W.D.Va.1996) (where inmate requested hardship transfer to be near his ailing wife and mother, prison officials' alleged refusal to transfer inmate did not implicate any constitutionally protected right); *Reffitt v. Nixon*, 917 F.Supp. 409, 413 (E.D.Va.1996) (plaintiff has no constitutionally protected liberty interest in being released into the general population). Thus, plaintiffs are not entitled to the protections of the Due Process Clause, because they have no protected liberty interest in obtaining a transfer to another institution or in obtaining access to the general prison population. Accordingly, the court grants defendants summary judgment on Claim # 7.

*H. Immunity from Suit*

■ Defendants claim they are entitled to summary judgment because they are immune from suit. To the extent that plaintiffs are suing defendants in their official capacities for money damages in this Complaint, defendants are immune from suit under the doctrine of sovereign immunity, be-

cause state officials acting in their official capacities are not "persons" within the meaning of § 1983.[6] *Will v. Michigan Department of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). If, on the other hand, plaintiffs are suing defendants in their individual capacities, they must affirmatively show that defendants "acted personally in the deprivation of the plaintiffs' rights." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir.1977); *see also McDonald v. Dunning*, 760 F.Supp. 1156, 1160 (E.D.Va. 1991). It is not enough to show that subordinates of a sued official deprived plaintiffs of their constitutional rights; the doctrine of *respondeat superior* has no application in § 1983 cases. *McDonald*, 760 F.Supp. at 1160; *see also Monell v. Department of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978); *Vinnedge*, 550 F.2d at 928. If plaintiffs have not alleged any personal connection between a defendant and a denial of their constitutional rights, that claim against that defendant must fail. *Vinnedge*, 550 F.2d at 928.

Where plaintiffs have sued defendants in their individual capacities, defendants may be entitled to summary judgment under the defense of qualified, or "good faith," immunity. In general, state officials performing discretionary functions are shielded from liability for monetary damages if they can prove that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The court must make the objective determination of whether the defendant could have reasonably believed that he or she was not violating plaintiff's constitutional rights under the circumstances alleged by the plaintiff. *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039–40. Where the underlying claim includes a subjective element, summary judgment is still possible where the defendant shows objective reason-

---

6. State officials sued in their official capacity for injunctive relief are treated as "persons" under § 1983 because such actions are not treated as

actions against the state. *Will*, 491 U.S. at 71 n. 10, 109 S.Ct. at 2312 n. 10.

ableness of his or her actions, and plaintiff is unable to point to specific evidence that the official's actions were improperly motivated. *Collinson v. Gott,* 895 F.2d 994, 1002 (4th Cir.1990) (Phillips, J., concurring).

[26] In this case, not only is there no evidence of a violation of plaintiffs' constitutional or statutory rights, but even if there was, it is clear that defendants would be entitled to the defense of qualified immunity. Defendants could have reasonably believed that they were not violating plaintiffs' constitutional rights under the circumstances alleged by the plaintiffs, and there is no evidence that defendants' actions were improperly motivated. Thus, defendants are entitled to an entry of summary judgment in their favor.

### IV. Conclusion

For the aforementioned reasons, the court GRANTS defendants' Motion for Summary Judgment. Plaintiffs are advised that they may appeal from this opinion and final order by forwarding a written notice of appeal to the Clerk of the United States District Court, United States Courthouse, 600 Granby Street, Norfolk, Virginia 23510. Said written notice must be received by the Clerk within thirty (30) days from the date of this opinion and final order.

**IT IS SO ORDERED.**